UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| Paul West, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 1:08-cv-0486-SEB-TAB |
| vs. | ) | |
| | ) | |
| WellPoint, Inc., et. al., | ) | |
| | | |
| Defendants. | | |

**ORDER DENYING PLAINTIFFS' MOTION
FOR LEAVE TO FILE AN AMENDED COMPLAINT**

Plaintiffs Paul West, Mary Alford, Jimmy H. Dresslar, James Halub, Patricia

Hoskins Jones, and Anthony Vigil (collectively, the "Plaintiffs") have brought this action

pursuant to §§ 502(a)(2) and (3) of ERISA derivatively on behalf of a retirement plan

("the Plan") sponsored by ATH Holding Company ("ATH"), a wholly owned subsidiary

of WellPoint, Inc. ("WellPoint").  Plaintiffs allege that Defendants were fiduciaries of the

Plan and breached various duties to Plaintiffs, in violation of ERISA.  Specifically,

Plaintiffs allege that: (Count I) Defendants failed to prudently and loyally manage the

Plan's investment in the WellPoint Stock Fund by continuing to offer it as an investment

option when it was no longer prudent to do so and by failing to provide complete

information to Plan participants regarding the prudence of investing in the WellPoint

Stock Fund; (Count II) Defendants failed to avoid or ameliorate inherent conflicts of

interest, which made them unable to function as independent fiduciaries; and (Count III)

Defendants failed to adequately monitor other persons to whom management/administration of Plan assets was delegated.  As recounted in much greater detail below, Plaintiffs allege that in order to maintain its image of strong financial growth, WellPoint overstated its earnings estimates and failed to inform Plan participants that the company's medical costs had surpassed its reserves and that enrollment in the company's more profitable policies had declined.  In addition, Plaintiffs allege that WellPoint engaged in certain improper practices that should have caused Defendants to realize that WellPoint's stock was overvalued.  Plaintiffs allege that the eventual disclosure of these matters caused a decline in the price of WellPoint stock and a detrimental impact on the value of the Plan's assets and retirement benefits.

Plaintiffs seek to recover losses to the Plan for which Defendants are personally liable, pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, Plaintiffs seek equitable relief, pursuant to ERISA § 502(a)(3).  The Court previously dismissed an earlier version of Plaintiffs' Complaint holding that Plaintiffs' allegations did not support an inference that any named individual Defendant knew or should have known information that would have rendered the decision imprudent to continue to offer WellPoint stock as a Plan investment option.  West v. WellPoint, Inc., No. 1:08-cv-0486-SEB-TAB, 2011 WL 1258022 (Mar. 30, 2011).  Pursuant to that ruling, Plaintiffs have now filed the instant Motion for Leave to File Amended Complaint [Docket No. 121], which Defendants oppose.  For the reasons detailed herein, Plaintiffs'

motion is <u>DENIED</u>.[1]

## I.    Factual Background

The facts below are taken from the Proposed Amended Complaint and for purposes of this motion are accepted as true.  See <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949-50 (2009).

### A.    The Parties

Plaintiffs were participants in the Plan and held WellPoint Stock in their individual Plan accounts during the proposed Class Period, October 24, 2007 to February 18, 2009.

Defendant WellPoint is an Indiana corporation and one of the largest health benefits companies in the United States.  Through its subsidiaries, WellPoint is licensed to conduct insurance in all 50 states.  Plaintiffs allege that WellPoint was a fiduciary of the Plan because it "bore ultimate responsibility for the management and administration of the Plan and/or management and disposition of the Plan's assets" by virtue of being the parent of both the Plan's sponsor, Defendant ATH, and its administrator, Defendant

---

[1]Unlike the last version of the Amended Complaint, Plaintiffs' Proposed Amended Complaint does not attach copies of certain plan documents that are referenced in the Proposed Amended Complaint and central to Plaintiffs' claims.  Defendants also did not attach these documents to their Response brief in opposition to Plaintiffs' Motion for Leave to File An Amended Complaint.  Rather, Plaintiffs attached the documents to their Reply brief along with the Declaration of Thomas J. McKenna, Co-Lead Class Counsel for Plaintiffs in this litigation. Plaintiffs have presented no authority that supports their position that it is proper, absent a conversion of the motion to one for summary judgment pursuant to Fed. R. Civ. P. 12(d), for the Court to consider these documents as part of the proposed pleading.  However, Defendants have presented no objection in the form of a sur-reply to our consideration of these documents. Therefore, we will assume that Plaintiffs' failure to attach the documents to the Proposed Amended Complaint was inadvertent and treat them as part of the pleadings for purposes of considering Plaintiffs' motion.

Anthem Insurance Companies, Inc. ("Anthem Insurance") and, more specifically, Anthem Insurance's Pension Committee. The board of directors of Anthem Insurance consists almost entirely of senior WellPoint executives and WellPoint, Anthem Insurance, and ATH all share the same address. Additionally, WellPoint had the authority to appoint and terminate members of the Anthem Insurance Pension Committee.

The Proposed Amended Complaint also names the following individuals as defendants: Wayne S. DeVeydt, John Cannon III, Nancy Louise Purcell, Carter Allen Beck, Robert Wade Hillman (the "Anthem Insurance Director Defendants"). These individuals were directors of Anthem Insurance and, with the exception of Hillman, officers at WellPoint. DeVeydt also served as a member of the Pension Committee.

The Proposed Amended Complaint names in addition the following individuals as defendants: Angela F. Braly, Sheila P. Burke, Larry C. Glasscock, Jane G. Pisano, Donald W. Riegle, Jr., William J. Ryan, Jacqueline M. Ward (the "WellPoint Director Defendants"). As noted above, Plaintiffs allege that WellPoint and its Director Defendants were fiduciaries of the Plan because they had the power to appoint and terminate members of the Anthem Insurance Pension Committee.

The Proposed Amended Complaint includes the following individuals as well, as defendants: Randal A. Brown, David C. Colby, and Cynthia S. Miller (the, "Pension Committee Defendants"). These Defendants served as members of the Pension Committee during the Class Period. They also were all officers of WellPoint, although only Miller and Brown served in that capacity during the Class Period. As mentioned

4

above, Defendant DeVeydt was a member of the Pension Committee as well and, thus, is treated here both as a "Pension Committee Defendant" and an Anthem Insurance Director Defendant.  According to the plan documents, the Pension Committee had "the sole responsibility for the administration of this Plan, which responsibility is specifically described in this Plan and the Trust."  Specifically, Plaintiffs allege that the Pension Committee had the following powers and duties:

> a. discretion to construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner and time of payment of any benefits hereunder;
>
> b. to prescribe procedures to be followed by Participants, Former Participants or Beneficiaries filing applications for benefits;
>
> c. to prepare and distribute information explaining the Plan;
>
> d. to receive from the Employer and from Participants, Former Participants and Beneficiaries such information as shall be necessary for the proper administration of the Plan;
>
> e. to furnish the Employer, upon request, such annual reports with respect to the administration of the Plan as are reasonable and appropriate;
>
> f. to receive, review and keep on file (as it deems convenient or proper) reports of the financial condition, and of the receipts and disbursements, of the Trust Fund from the Trustees; and
>
> g. to appoint or employ advisors including legal and actuarial counsel to render advice with regard to any responsibility of the Pension Committee under the Plan or to assist in the administration of the Plan.

Prop. Am. Compl. ¶ 106.  Further, the Pension Committee had "the exclusive authority and discretion to select the investment funds . . . available for investment under the Plan." Id. ¶ 108.

Finally, the Proposed Amended Complaint asserts claims against additional "John Doe" Defendants whose names will be added once their identities are ascertained via discovery.

**B.     The Plan**

The Plan is a "defined contribution plan" within the meaning of ERISA § 3(34).  It was originally established effective July 1, 1979, but has been amended and restated several times since then.  Since January 1, 2006, the Plan has been referred to as the WellPoint 401(k) Retirement Savings Plan.  Throughout the Class Period, Plan participants were permitted to defer a percentage of their pay for investment in the Plan. After one year of service, WellPoint matches every dollar invested by the participant into the Plan up to the first six percent (6%).  Plan participants direct their investment contributions into certain investment options.

The WellPoint Stock Fund is one of an unspecified number of investment options offered to Plan participants.  Plaintiffs allege that there is no limit on the Plan fiduciaries' ability to remove the WellPoint Stock Fund as an investment option or to divest assets invested in that Fund as prudence may dictate.

Participants were entitled to reallocate the value of their accounts "in multiples of one percent (1%) among the Investment Funds or in flat dollar amounts, or in such other manner as may from time to time be determined by the Plan Administrator, by giving notice to the Pension Committee . . . ."  Plan Document at 7.2(b)(ii).  While the Pension Committee is not obligated to make the changes in allocation as of the business day that

6

the Participant gives notice of such an intention, it must do so "as soon as administratively feasible." Id. at 7.2(b)(iii).

### C.     Events Leading Up to This Lawsuit

As referenced above, WellPoint is licensed to conduct insurance operations in all 50 states through its subsidiaries.  WellPoint sells two primary types of insurance policies, "self funded" and "fully funded."  Under self-funded policies, WellPoint charges a service fee, while the employer or policy sponsor reimburses WellPoint for all or most of the healthcare costs.  Under fully funded policies, WellPoint charges the insured a premium and assumes the healthcare financial risks.  Self-funded policies are less profitable to WellPoint than fully funded ones.

In 2006, the bulk of WellPoint's business shifted from fully funded to self funded plans, which, as mentioned above, were less profitable for the company.  This loss of profitability was exacerbated by rising medical costs occurring at the same time, which caused more WellPoint customers to choose the less expensive self funded policies.  Furthermore, WellPoint lost additional fully funded customers when it consolidated certain Blue Bross/Blue Shield entities that it had recently acquired.  As a result of this shift from the fully funded policies, WellPoint's overall revenues decreased substantially.

At this same time, WellPoint was rapidly expanding through a series of business acquisitions, which brought with them to WellPoint various operating systems, requiring the company to undertake the task of integrating eight different systems.  This integration process complicated the processing and accounting for customer claims, payments, and

receipts, resulting in the failure of operational controls.  The problems encountered with integrating these computer and operating systems were well known at the highest levels of WellPoint management.

Plaintiffs allege that one of the results of WellPoint's failure to effectively and efficiently integrate its operations systems was a failure to set aside a reasonable and accurate amount of reserves for unpaid claims and medical costs.  Specifically, the company's actuaries who set the reserve levels were required to calculate those levels based on anecdotal estimates.  WellPoint's former Director of Customer Care reported that Defendant Braly had been kept apprised of this problem based on reports sent to her. This employee also reported at least two meetings between Defendant Braly and WellPoint's Vice President of Consumer Services Operations during which this issue was the focus.

WellPoint's failure to properly and efficiently integrate the multiple operations systems also impeded its ability to retain and generate business at a time when (as explained above), the company was already losing many of its fully funded customers.

By January 30, 2007, these failures had resulted in substantial delay in claims processing and the payment of medical providers.  The company held several meetings in early 2007 to discuss the possibility for building a new integrated, automated billing system.  However, the failures continued into 2008, prompting the Centers for Medicare Services ("CMS") eventually to sanction WellPoint in January 2009, in part, because of

these problems.[2]

On October 24, 2007, WellPoint released its fiscal third-quarter 2007 results and earnings guidance for 2008, in connection with which Defendant Braly commented that the company remained committed to its earnings per share growth target of at least 15 percent.

On December 11, 2007, WellPoint issued a press release along with its Form 8-K that confirmed the company's ability to meet the earnings expectations it announced in October and also announced WellPoint's earnings guidance for full fiscal year 2008 as $6.41 per share. This optimism was emphasized both by a statement by Defendant DeVeydt and in the company's Form 8-K to the SEC on January 7, 2008.

On January 23, 2008, WellPoint released its fiscal fourth quarter and full year 2007 results in its Form 8-K to the SEC. At that time, Defendant DeVeydt reiterated that the company "remain[ed] confident in our earnings per share target of $6.41 for 2008, which represents annual growth of 15.3%." Also on that date, WellPoint held its fiscal fourth quarter 2007 Earnings Conference Call, during which Defendants Braly and DeVeydt spoke as representatives of WellPoint. Defendant Braly reiterated the optimistic guidance, commenting that the "reduced membership" that the company experienced in 2007 had had no impact on the company's earnings per share. While acknowledging that

---

[2]On January 13, 2009 CMS suspended WellPoint's right to solicit and market to new subscribers to Medicare. CMS noted that WellPoint "demonstrated a longstanding and persistent failure" to comply with regulations and that its conduct had long been posing "a serious threat to the health and safety of Medicare beneficiaries." Plaintiffs allege that this suspension ultimately cost the company millions of dollars.

WellPoint had experienced a rise in medical costs in fiscal fourth quarter 2007, Defendant DeVeydt reassured investors with the following statements:

- "the higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008;"

- "our 2008 benefit expense ratio guidance remains at 81.6% for the year, given the strong full-year 2007 operating results;"

- "we continue to expect our 2008 medical cost trend to also be less than 8%;"

- "medical enrollment is now expected to approximate 35.6 million members with fully insured membership now expected to be 17.1 million and self-funded membership expected to be 18.5 million;" and

- "operating revenue is now expected to total approximately $62.6 billion."

During the 2007 Earnings Conference Call, an analyst raised the concern that the company was forced to increase its reserves for medical costs at year-end 2007 as a result of the decreased price of WellPoint's products and higher medical costs.  Defendant DeVeydt acknowledged that the analyst's point was "dead on" for 2007 but that he (DeVeydt) was not concerned that there might be a similar outcome in 2008.  In further reference to the 2007 increase in reserves, he acknowledged that the company "had pretty good visibility that we were starting to develop less favorably" by mid-February 2007.  In reference to the adequacy of the company's reserves for medical costs in 2008, Defendant DeVeydt further stated, "We've met with the actuaries . . . and . . . we want to ensure that

10

when we go into '08, that we go in with great confidence, that we're not going to fall short." Finally, Defendant DeVeydt stated that the company had factored in an assumption for an economic slowdown into its 2008 guidance.

On February 21, 2008, WellPoint released its Form 10-K for 2007. Therein, WellPoint assured investors that "[w]e continually monitor and adjust the claims liability and benefit expense based on subsequent paid claims activity" and that the company was able to quickly and accurately assess the adequacy of its reserves for medical costs. The Form 10-K did not disclose the significant rise in medical costs, the unprofitable shift toward self funded policies, the company's lower pricing for its products, or the view that any prior guidance issued by the company was unreliable.

On March 10, 2008, WellPoint issued a press release bearing the headline, "WellPoint Revises 2008 Earnings Per Share Guidance" in which the company announced that its first quarter earnings per share were expected to be in the range of $1.16 to $1.26, as opposed to the previous guidance of $1.44 per share. The company also revised its full year earnings per share to a range of $5.76 to $6.01, as opposed to the previous guidance of $6.41 per share. Defendant Braly attributed these revised (reduced) earnings to "higher than expected medical costs, lower than expected fully ensured enrollment and, to a lesser extent, the changing economic environment in which we are operating." The March 10, 2008 Form 8-K also attributed the revised guidance to these developments:

  •    Higher Than Expected Medical Costs. The Company incurred

11

higher-than-expected medical costs during the first two months of 2008 and has revised its full year outlook for Individual and Local Group fully insured medical cost trends to a range of 8.0 percent, plus or minus 50 basis points. Medical cost trends are also being impacted by less favorable than expected prior year reserve development in 2008.

• Lower Than Expected Fully Insured Enrollment. Medical enrollment exceeded 35.2 million members as of February 29, 2008, representing growth of 410,000 members from December 31, 2007. Although this overall membership increase was in-line with the Company's expectation, the composition of growth was weighted more towards self-funded products than the Company planned. Enrollment in fully insured products was below expectations primarily due to a shortfall in Medicare Advantage growth and declines in Small Group and Individual membership.

• Changing Economic Environment. The Company believes that current economic conditions have partially contributed to the lower fully insured enrollment results and higher than expected benefit buy-downs. In addition, a Medi-Cal premium reduction is scheduled for July 1, 2008, in California, the Company's largest State Sponsored market with approximately 1.2 million members.

Prop. Am. Compl. ¶ 169.

Following these announcements, WellPoint's stock price declined $18.66 per share, from $65.92 on March 10, 2008 to $47.26 per share on March 11, 2008. Several investment firms also downgraded their ratings of WellPoint stock.

Plaintiffs also allege that WellPoint engaged in a series of questionable business practices that led to further devaluation of the WellPoint Stock. For example, in 2007, an article in the *Los Angeles Times* reported that the California Department of Managed Health Care had conducted an investigation and determined that Blue Cross of California, a WellPoint unit, had engaged in a systemic practice of canceling individual health

insurance coverage after certain policyholders had become pregnant or sick.  The article reported that the investigation had been triggered by "stories that disclosed that the insurer . . . routinely canceled coverage of individual policyholders after they got sick, prompting some to lose their homes and suffer other hardships."  Prop. Am. Compl. ¶ 150.  In February 2007, the California Department of Managed Health Care announced its intention to impose a $1 million monetary penalty against Blue Cross of California for engaging in these practices.  In May 2007, WellPoint settled a class action suit that had been filed in 2001 on behalf of 6,000 policyholders who alleged that their coverage had been canceled improperly.  Finally, in June 2007, the California Department of Insurance issued a final report levying a number of citations against WellPoint for violations of fair-claims handling laws.

In addition, Plaintiffs claim that WellPoint's stock was overvalued because of a form of improper activity, which they call "the Ingenix scheme," allegedly engaged in by WellPoint and other healthcare providers.  As background, Plaintiffs' allegations explain that consumers who participate in health insurance policies allowing them to choose their physicians from outside of the providers' network pay higher premiums than those whose plans limit their choice to doctors within the providers' network.  When WellPoint's customers choose a doctor outside of WellPoint's network, the members are reimbursed for their healthcare costs.  However, the amount of reimbursement is set at the lesser of either the actual billed charge or the "usual and customary rate" ("UCR") of doctors in the same geographic area for the same service.

Before the start of the proposed Class Period, WellPoint and other health insurers used schedules compiled by a company called Ingenix to detemine the UCRs for out-of-network healthcare. Plaintiffs allege, however, that Ingenix was a "conflict-ridden and defective system" that set artificially low reimbursement rates for out-of-network services.[3] As a result, WellPoint, in turn, reimbursed its members at artificially low rates.

On February 13, 2008, the New York State Attorney General charged Ingenix with fraud for providing the defective and manipulated database to insurers, including WellPoint. In February 2009, WellPoint agreed to pay $10 million to settle the claims against it brought by the New York Attorney General in connection with the Ingenix scheme. WellPoint also signed an "Assurance of Discontinuance" in which it promised to discontinue using or supplying data to or from Ingenix. At that time, WellPoint's Executive Vice President and Chief Executive Officer of WellPoint's Commercial Business, Ken Goulet, acknowledged the conflicts of interest that inhered to its relationship with Ingenix.

In sum, Plaintiffs allege that WellPoint stock was artificially inflated and, thus, an imprudent investment for the Plan, due to the following (as excerpted from the Proposed Amended Complaint):

_____

[3]Ingenix gathered its data from health insurers, including WellPoint, and then sent those rates back to the insurers based on the pooled data. Plaintiffs allege that this created a "closed loop system" that allowed the insurers to monitor the data they contributed to Ingenix and eliminate outlying high costs to ensure that Ingenix provided unreasonably low rates back to the insurers. Plaintiffs allege that this had the effect of allowing WellPoint to reimburse its members at rates of up to 30% less than the actual rates for those services.

a. WellPoint continued to experience significant increases in medical costs to the extent that Defendants had no basis in fact which supported their earnings guidance or their benefit expense ratio guidance;

b. WellPoint's reserves for medical costs were understated, in part, because the claims incurred in 2007 were significantly higher than the reserves established for those claims, which would negatively impact WellPoint's profitability;

c. WellPoint's enrollment growth was heavily weighted toward self-funded products largely due to the loss of fully-insured customers, and the self-funded products were substantially less profitable for WellPoint than the fully-insured policies;

d. WellPoint did not achieve significant new enrollment of fully-insured members in 2008, and growth in Medical Advantage greatly slowed while the enrollment in small group and individual membership policies also declined.  Defendants further knew or should have known that WellPoint had experienced a decline in fully-insured members throughout 2007 and that there was no basis for this trend to change in 2008;

e. WellPoint was being adversely impacted by economic factors which were not neutralized by WellPoint's geographic diversity and to an extent greater than the Company had factored into its 2008 guidance;

f. WellPoint had inadequate internal controls, including but not limited to failing to consolidate its multiple IT systems, which led to its inability to access and generate accurate financial data;

g. WellPoint's internal staff, including but not limited to, its actuaries, were unable to analyze proper data and consequently unable to provide meaningful input to senior management;

h. WellPoint's control failures led to inaccurate data;

i. WellPoint engaged in unfair business practices, including but not limited to, its conflict of interest in artificially deflating actuarial data with Ingenix and other major insurers; and

j. CMS's investigation of WellPoint's system failures.

## II.    Legal Analysis

As noted above, Plaintiffs have filed a Motion for Leave to File An Amended Consolidated Complaint, pursuant to Fed. R. Civ. P. 15.  Although such leave is generally freely given, undue delay, bad faith, dilatory motive on the part of the movant, undue prejudice to the opposing party or futility of amendment may justify denial of such leave. See Fed. R. Civ. P. 15; Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 666 (7th Cir. 2007).  Defendants maintain that denial is appropriate here because to allow the Proposed Amended Complaint would be futile given that it fails to cure the deficiencies of the prior version of the complaint and could not survive a second motion to dismiss.  Specifically, Defendants oppose Plaintiffs' motion on the following grounds: (1) Plaintiffs fail to clarify the basis for their claim that WellPoint and its directors are fiduciaries; (2) Plaintiffs include as defendants individuals and groups who have no connection to the Plan; (3) Plaintiffs fail to state facts alleging or otherwise indicating that any one of the individually-named Defendants knew or should have known information rendering WellPoint stock an imprudent investment or that statements made by them during the Class Period were false; (4) Plaintiffs fail to allege additional facts that would amount to "red flags" signaling the imprudence of their continuing to offer WellPoint stock as an investment option.

As Defendants point out, the standard for determining whether a proposed amendment would be futile is whether the proposed amendment cures the deficiencies of the prior pleading or whether it could survive a second motion to dismiss.  Perkins v.

Silverstein, 939 F.2d 463, 472 (7th Cir. 1991).  To survive a motion to dismiss, Plaintiffs'

allegations for breaches of fiduciary duties and ERISA violations must comply with the

requirements of Federal Rule of Civil Procedure 8(a)(2), which straightforwardly

mandates "a short and plain statement of the claim showing that the pleader is entitled to

relief[.]"  However, "a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S.Ct. 1937,

1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544,

570, 127 S. Ct. 1955, 167 L. Ed. 2d 929, (2007)).  "Threadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice."  Id.  A party

moving to dismiss nonetheless bears a weighty burden.  "[O]nce a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint."  Twombly, 550 U.S. 544, 563, 127 S. Ct. 1955, 167 L. Ed.

2d 929 (2007) (citing Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40

F.3d 247, 251 (7th Cir. 1994) ("[At the pleading stage] the plaintiff receives the benefit of

imagination, so long as the hypotheses are consistent with the complaint.")).  We treat all

well-pleaded factual allegations as true, and construe all inferences that reasonably may

be drawn from those facts in the light most favorable to Plaintiffs.  Lee v. City of

Chicago, 330 F.3d 456, 459 (7th Cir. 2003); Szumny v. Am. Gen. Fin., 246 F.3d 1065,

1067 (7th Cir. 2001).

   In ruling on Plaintiffs' motion to amend and determining whether the Proposed

Amended Complaint could withstand a motion to dismiss, we look to see if Plaintiffs

have sufficiently alleged: (1) that each respective defendant was a fiduciary to the Plan; (2) that there was some breach of each respective defendant's fiduciary duty; and (3) that any such breach caused harm to Plaintiffs.  See Howell v. Motorola, Inc., 633 F.3d 552, 562 (7th Cir. 2011).

### A.    Each Defendant's Fiduciary Status

In the Court's prior Order, we made no findings with regard to whether Plaintiffs had sufficiently alleged the fiduciary status of each Defendant.  Even so, because we allowed Plaintiffs to seek leave to amend his Complaint, we asked that they clarify the relationship between Defendants WellPoint and Anthem.  Contrary to Defendants' contentions, Plaintiffs' Proposed Amended Complaint does clarify the relationship between these two entities.

With the exception of Plaintiffs' allegations regarding Anthem and WellPoint, which rely on the doctrine of *respondeat superior*, we address the fiduciary status of Defendants below, which matters to our analysis only if Plaintiffs have also alleged a breach of that fiduciary duty by each named Defendant.  Because we ultimately conclude that Plaintiffs have not sufficiently alleged such breaches, our analysis regarding their respective fiduciary status is only relevant to that subsequent discussion.

### 1.    Anthem Insurance, Its Board of Directors, and the Anthem Pension Committee

According to the Plan, the term "Fiduciary" "means the Employer, the Board of Directors, the Pension Committee or the Trustee, but only with respect to the specific

18

responsibilities of each with respect to Plan and Trust administration and only to the extent required by ERISA." Plan Doc. § 2.33. The terms "Employer," "Board of Directors," and "Pension Committee" are all defined by the Plan as those of "Anthem Insurance Companies, Inc." See Id. at §§ 2.11, 2.13, 2.15, 2.33. In other words, Anthem, its Board, and its Pension Committee as identified in the Plan are fiduciaries in the context of their specific duties and responsibilities.

According to the Plan, the "Pension Committee" is the administrator of the Plan. Plaintiffs allege that the Pension Committee had the exclusive authority and discretion to select the investment funds . . . available for investment under the Plan." Prop. Am. Compl. ¶ 107. Thus, Plaintiffs have sufficiently alleged that the Pension Committee was responsible for the decision to retain WellPoint Stock as a Plan investment option and was, thus, a fudiciary of the Plan.[4]

---

[4]As explained above, the Pension Committee is made up of the following individual Defendants: Randal A. Brown, David C. Colby, Cynthia S. Miller, and Wayne S. DeVeydt. As members of the Pension Committee, these individuals are also fiduciaries of the Plan. Thus, we discuss the Pension Committee and its members interchangeably.

Defendants argue that the Pension Committee cannot be a defendant here because it is not a "person" under ERISA. Defs.' Resp. at 10. They point out that "person" as defined by ERISA includes "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization" and that because committees are not included in this list, they are not subject to liability based on ERISA for a breach of fiduciary duty. The Seventh Circuit discussed this issue in Howell, explaining that its previous decision in Line Construction Benefit Fund v. Allied Electrical Contractors, Inc., 591 F.3d 576, 579-80 (7th Cir. 2010) that a multiemployer plan was a fiduciary that could sue and be sued under section 502(a)(3), 29 U.S.C. § 1132(a)(3) supported a holding that a committee was to be regarded as an entity that could sue or be sued under ERISA. 633 F.3d at 564. In Howell, as in this case, however, this determination is relevant only if we find that Plaintiffs have adequately alleged a breach of fiduciary duty. Because we

(continued...)

The Plan provides that Anthem's Board has "the sole authority to appoint and remove the Pension Committee and to amend or terminate, in whole or in part, this Plan or the Trust." Under Seventh Circuit precedent, "a company can be a plan fiduciary when there is evidence that it played a role in appointing the administrators of the plan (and thus had a duty to choose appointees wisely and to monitor their activities)." Howell, 633 F. 3d at 562 (citing Leigh v. Engle, 727 F.2d 113, 134-35 (7th Cir. 1984)). Accordingly, Plaintiffs have sufficiently alleged and the Plan supports the inference that Anthem's Board of Directors was charged with the duty to appoint the Pension Committee, i.e. the Plan's administrators thus possessed fiduciary duties related to those powers.[5]

Finally, we turn to Anthem itself. As mentioned above, the Plan does, indeed, name Anthem as a fiduciary but only to the extent that it has specific responsibility for the Plan and to the extent allowed by ERISA. Plaintiffs' Proposed Amended Complaint alleges that Anthem is a fiduciary of the Plan by virtue of the authority that reposes in its Board of Directors. Defendants do not specifically dispute this assertion.[6] In Howell v.

---

[4](...continued)
conclude that they have not, we, like the Seventh Circuit, will sidestep that issue for now and simply assume that the committee qualifies as a defendant, and our analysis shall proceed accordingly.

[5]As noted previously, Anthem's Directors include the following individuals: Wayne S. DeVeydt, John Cannon III, Nancy Louise Purcell, Carter Allen Beck, and Robert Wade Hillman. As members of Anthem's Board of Directors, these individuals are also fiduciaries of the Plan. Thus, again, we discuss Anthem's Board and its members interchangeably.

[6]Rather than dispute Plaintiffs' *respondeat superior* argument, Defendants instead argue that Plaintiffs have named Anthem *Life* Insurance Companies, Inc., an entity they refer to as

(continued...)

Motorola, Inc., the Seventh Circuit discussed the extent to which *respondeat superior*

liability is available under ERISA, as follows:

> The federal common law of agency supplies the governing principles in
> ERISA cases. See, e.g., Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318,
> 322-23, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992). The doctrine of
> *respondeat superior* can be found within that body of law. The Fifth
> Circuit has held that a company might be liable under section 502(a)(2), but
> "only when the principal actively and knowingly participated in the agent's
> breach." The Sixth Circuit permits vicarious liability even without a
> showing that the principal played an active and knowing part in the breach.
>
> This court has implicitly recognized *respondeat superior* liability in ERISA
> cases. In Wolin v. Smith Barney Inc., we described a case as one in which
> a plaintiff had charged that a fiduciary, "and so by the principle of
> respondeat superior his employer as well," had violated the statute. In
> Wolin, however, we did not need to decide how far this principle should
> reach. It is a knotty problem. On the one hand, ERISA is a comprehensive
> statute that spells out exactly who should be liable for what; engrafting
> extra common-law remedies on top of that scheme is something that should
> not be done lightly. On the other hand, we have Darden and many other
> decisions telling us that ERISA must be read against the backdrop of the
> common law of agency (as well as other parts of the common law).

Howell, 633 F.3d at 563 (citations omitted). Accordingly, we must determine only the

extent to which Anthem (or any other Defendant) is a fiduciary of the Plan based on the

responsibilities of its Board of Directors', assuming that Plaintiffs' allegations sufficiently

allege that each member of the Board is liable for its respective breach of fiduciary duty.

Because we have determined that Plaintiffs have failed to allege that any member of

---

[6](...continued)
ALICI, as opposed to Anthem Insurance Companies, Inc. However, as Plaintiffs point out, the
inclusion of the word "Life" in Paragraph 4 of the Proposed Amended Complaint appears to be a
scrivener's error; the remainder of the Proposed Amended Complaint makes clear that Anthem
Insurance Companies, Inc., as opposed to "ALICI," is the intended Defendant.

Anthem's Board is liable for a breach of fiduciary duty, we need not address or attempt to resolve Plaintiffs' *respondeat superior* argument.

**2.    ATH Holding Company**

The Proposed Amended Complaint alleges that the Plan is sponsored by ATH, a wholly owned subsidiary of WellPoint.  However, other than specifying ATH's role as the Plan's sponsor, the Proposed Amended Complaint contains no other allegations regarding any authority or discretion ATH may have possessed under the Plan.  Plaintiffs have also failed to provide any response to Defendants' argument in opposing the amended complaint that ATH has no role that would make them liable in any way in this litigation.

**3.    WellPoint and Its Board of Directors**

The Proposed Amended Complaint alleges that, according to the WellPoint Compensation Committee Charter, WellPoint's Board of Directors and its Compensation Committee, which is a subset of the WellPoint Board,[7] had the authority to appoint and terminate members of Anthem's Pension Committee.  While Plaintiffs cite to this charter to substantiate this allegation, we have not been provided a copy of it and it is not otherwise a part of the pleadings.  Accepting Plaintiffs' allegations in the light most

---

[7]The following WellPoint Directors were members of WellPoint's Compensation Committee: Sheila P. Burke, Jane G. Pisano, Donald W. Riegle, Jr., William J. Ryan, Jacqueline M. Ward.  Although the Compensation Committee is not named as such as a Defendant, all of these individuals are included as named Defendants as members of WellPoint's Board of Directors.  Defendants Angela Braly and Larry Glasscock are also members of WellPoint's Board of Directors but were apparently not members of the Compensation Committee.

favorable to them, we assume that the Compensation Committee's charter does in fact vest WellPoint's Board of Directors with authority for the membership of the Pension Committee.  Anthem's Board of Directors apparently has this same authority. Accordingly, we conclude that WellPoint's Board of Directors possessed a fiduciary duty relating to those appointments and the monitoring of Anthem's Pension Committee.

Plaintiffs again assert a *respondeat superior* argument with regard to WellPoint's fiduciary responsibilities vis-a-vis its Board of Directors and Compensation Committee. As with Anthem, however, we again decline to address this issue directly based on our conclusion that Plaintiffs have failed to allege a breach of fiduciary duty on the part of each of those Directors and/or Compensation Committee members.

### B.      Breach of Fiduciary Duty

As explicated above, once Plaintiffs allege that each Defendant possessed a fiduciary duty, the Proposed Amended Complaint must also include allegations that a breach of each respective Defendant's fiduciary duty was committed.  See Howell, 633 F.3d at 562.  "ERISA requires fiduciaries to discharge their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aim.'"  Patten v. N. Trust Co., 703 F. Supp. 2d 799 (N.D. Ill. 2010) (quoting 29 U.S.C. § 1104(a)(1)(B)).

Defendants maintain that Plaintiffs have failed to allege a breach of such a duty as evidenced in two ways: First, they contend that Plaintiffs have failed to allege knowledge

23

of any specific facts on the part of any particular Defendant.  Second, they note that any knowledge that Plaintiffs have sufficiently alleged is of facts that were not "red flags" that could have or should have signaled to Defendants that WellPoint Stock had become an imprudent investment.  These are related arguments because to survive Defendants' opposition to their motion to amend, Plaintiffs must allege in the Proposed Amended Complaint that Defendants were privy to facts that should have tipped off a reasonable fiduciary to the fact that WellPoint's stock had become so risky or worthless that it should have been withdrawn as a Plan investment option.  See Howell, 633 F.3d at 568-69.

In our prior order dismissing Plaintiffs' Amended Complaint, we held that Plaintiffs' allegations were insufficient for lack of any claim that the Defendants should have known that WellPoint's stock was artificially inflated or that the decision to continue to offer WellPoint stock as an option to Plan participants was imprudent. Specifically, we noted in that ruling that Plaintiffs failed to allege facts to show, or to support an inference that any particular Defendant was privy to adverse information regarding the company's stock, and that Defendants' alleged "admissions" were unremarkable because they did not amount to "red flags" capable of signaling the requisite imprudence in continuing to offer WellPoint stock as a Plan investment option.

In an effort to remedy these deficiencies, Plaintiffs' Proposed Amended Complaint references WellPoint's "deteriorated financial condition" and clarifies the overlapping relationship between WellPoint and other Defendants in an apparent attempt to establish that those Defendants were well positioned to know the gravity of the circumstances

24

facing the company.  These circumstances were the allegations regarding the CMS sanctions and WellPoint's involvement in the Ingenix scheme as well as the shift in business toward less profitable self-funded policies and the failure of the Company to successfully integrate the operations systems among the several acquired entities negatively impacting the company's ability to process medical claims that were alleged in the previous version of the Amended Complaint.

In Howell v. Motorola, Inc., the Seventh Circuit examined a case, not unlike the one before us here, where the plaintiffs' claim was based upon the theory that the defendants had violated their fiduciary duty of prudence by including the stock of Motorola, Inc. as a retirement plan investment option.[8]  In Howell, plaintiffs alleged that a failed business transaction with a certain company in Turkey should have caused defendants to remove that stock as an investment option.  When news of the failed transaction became public, plaintiffs' evidence revealed that the Motorola stock price decreased by 23% in a single day.  Despite this decline, the Court deemed the plaintiffs' evidence that the defendants had breached their fiduciary duty by continuing to offer the stock as an investment option as "fatally thin."  633 F.3d at 568.  The Court explained:

---

[8] The undersigned judge recently ruled in a similar case, DeWald v. Zimmer Holdings, Inc., 2011 U.S. Dist. LEXIS 148844 (Dec. 23, 2011), in which we found the Seventh Circuit's discussion in Howell instructive.

Plaintiffs do not distinguish Howell from this case, except to point out that Howell was determined at summary judgment with the benefit of a full factual record, as opposed to here where the parties are still at the pleadings stage.  Without overlooking this distinction and, acknowledging that Plaintiffs face a different standard of proof as that in Howell, we still find Howell instructive with regard to the required elements of Plaintiffs' case if they are to survive a motion to dismiss.

A single plan participant directing his or her pension account does not have a duty to diversify assets. Even for normal employee stock ownership plans ("ESOPs"), courts apply a presumption of prudence where the fiduciary in charge of the plan is directed by the plan to invest in the company's stock. The decision of the Plan fiduciaries in the present case to continue offering—as one option—the Motorola Stock Fund must be evaluated against that backdrop. And in any event, even if this were a benefit plan devoted exclusively to Motorola stock, "[m]ere stock fluctuations, even those that trend down significantly, are insufficient to establish the requisite imprudence . . . ." The value of Motorola stock did not collapse in a day, or even in a few days. Plan participants were entitled throughout the class period—with the very brief exception of the blackout period, during which the stock price did not fall much at all—to move their dollars away from the Motorola Stock Fund into a different fund on a daily basis; anyone concerned by the downward trend that persisted for some time could have done so (and it is probable that many people did).

We have suggested before that the tension faced by the administrators of an ESOP between protecting against risk and establishing a portfolio dominated by company stock is "not acute if the participants in the ESOP have adequate sources of income or wealth that are not correlated with the risk of the [company] stock . . . ." The very existence of the three other investment options (until July 1, 2000) or eight other options (after that date), in the absence of any challenge to any of those other funds, offers assurance that the Plan was adequately diversified and no participant's retirement portfolio could be held hostage to Motorola's fortunes. Furthermore, the evidence does not portray a situation in which Motorola was facing imminent collapse. The volatility that Motorola stock was experiencing was within the bounds described by the Plan documents. Throughout the period covered by this case, Motorola was a fundamentally sound company. Nothing should have tipped the Plan's fiduciaries off to the (dubious) proposition that Motorola's stock had become so risky or worthless that the Motorola Stock Fund itself had to be withdrawn from the Plan immediately. In short, the plaintiffs have not done enough to defeat the defendants' motion for summary judgment, insofar as it relates to the alleged imprudence of the Plan's inclusion of the Motorola Stock Fund as one of several investment vehicles.

Id. at 568-69.

In our case, it is unclear how many other investment options were available to Plan

participants and to what extent Plan participants were warned about the potential for volatility with regard to WellPoint's stock price. Still, we find that Plaintiffs' allegations regarding the decrease in WellPoint's stock price during the Class Period do not support a finding that the company was facing "imminent collapse" or that the company's stock had become "so risky or worthless" that the WellPoint Stock Fund should have been withdrawn as a Plan investment option.

The Proposed Amended Complaint alleges that on March 10, 2008 following WellPoint's revision of its earnings guidance, WellPoint's stock price declined by $18.66 per share, from 65.92 to $47.26. Prop. Am. Compl. ¶ 171. By February 18, 2009, nearly a year later, WellPoint's stock was trading at $40.79 per share (although Plaintiffs do not specify the point(s) at which the additional stock price declines occurred over the course of that year). Thus, the largest decrease in the stock price reached approximately 28%, an amount that was only 5% more than Motorola's stock price decrease which occurred in a single day in Howell and which the Seventh Circuit deemed insufficient to establish a finding of imprudence on the parts of the fiduciaries. As explained in Howell, "[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence . . . [to establish a breach of fiduciary duty]." Howell, 633 F.3d at 568-69 (quoting Wright v. Oregon Metallurgical Corp. 360 F.3d 1090, 1099 (9th Cir. 2004)). As Plaintiffs recognize, WellPoint is one of the largest health benefits companies in the United States, (Prop. Am. Compl. ¶ 29), and these events occurred during the global economic downturn in 2008 and 2009. We, therefore, hold that the

27

stock fluctuations alleged by Plaintiffs fail to support a claim that the Pension Committee's decision to continue to offer WellPoint stock as an investment option was imprudent.

In addition, while Plaintiffs' new allegations regarding the investigations into the company's recission practices in California, the CMS sanctions, or the Ingenix scheme may highlight bad business practices on the part of WellPoint or industry-wide, there is no allegation that knowledge of these circumstances should have put any Defendant on notice that WellPoint stock was an imprudent investment. As mentioned above, the sanctions by CMS were issued in January 2009. Prop. Am. Compl. ¶ 177. Plaintiffs allege that the sanctions were "a severe blow to the Company" and that, according to a former WellPoint employee, the sanctions "threatened to eliminate an enormous base of senior citizen business." Id. ¶ 181. However, the Proposed Amended Complaint fails to elucidate the effect, if any, of the sanctions on WellPoint's stock price.

With regard to the Ingenix scheme, the Proposed Amended Complaint alleges that the New York State Attorney General announced on February 13, 2008 that charges would be brought against Ingenix for fraud. A year later, in February 2009, WellPoint agreed to pay $10 million to settle to the New York State Attorney General's action brought in connection with the Ingenix matter. However, as was true with regard to the CMS sanctions allegations, Plaintiffs have failed to allege any connection between a decrease in WellPoint's stock price and WellPoint's business dealings with Ingenix or the settlement entered into by WellPoint with the New York State Attorney General.

With regard to the allegedly improper policy recission practices that occurred in California, the Proposed Amended Complaint alleges that information regarding the company's practices was made public in March of 2007, several months before the beginning of the proposed class period.  Thus, it is entirely unclear what relevance, if any, these allegations have to the present lawsuit.

In sum, we find that Plaintiffs have failed to sufficiently allege knowledge on the part of any Defendants of any circumstances that could be considered a "red flag" capable of putting them on notice that WellPoint stock had become an imprudent investment. Without such claims, Plaintiffs' claims of a breach of fiduciary duty and investment imprudence cannot proceed.

### C.    Counts II (Conflict of Interest) and III (Failure to Monitor)

The parties appear to agree Plaintiffs' Counts II and III are derivative of Count I. Specifically, Count II alleges that the decision to retain WellPoint Stock as a Plan investment option reflected Defendants' decision to place the interests of the Company or of themselves individually over those of the Plan.  Count III's allegations likewise are dependent on the underlying decision to retain WellPoint stock as a Plan investment option being imprudent.  Because we have determined that Plaintiffs have failed to sufficiently allege the imprudence of that underlying decision, these conflict of interest and failure to monitor claims also fail.

### III.    Conclusion

For the reasons detailed herein, we conclude that Plaintiffs' motion to amend the

Complaint is not well taken because amendments such as those proposed by Plaintiffs

would be futile.  Thus, Plaintiffs' Motion [Docket No. 121] is <u>DENIED</u> and the case is

<u>DISMISSED WITHOUT PREJUDICE.</u>

       IT IS SO ORDERED.


Date:_____02/28/2012_____

                                SARAH EVANS BARKER, JUDGE
                                United States District Court
                                Southern District of Indiana

Copies to:

Matthew Thomas Albaugh
FAEGRE BAKER DANIELS LLP - Indianapolis
matthew.albaugh@faegrebd.com

Seth  Aronson
O'MELVENY & MYERS LLP
saronson@omm.com

Edward W. Ciolko
Kessler Topaz Meltzer & Check, LLP
eciolko@ktmc.com

Robert N. Eccles
O'MELVENY & MYERS LLP
beccles@omm.com

Stephen J. Fearon Jr.
SQUITIERI & FEARON, LLP
stephen@sfclasslaw.com

Lori G. Feldman
MILBERG LLP
lfeldman@milberg.com

Theresa S. Gee
O'MELVENY & MYERS, LLP
tgee@omm.com

Lindsay L. Geida
O'MELVENY & MYERS LLP
lgeida@omm.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Mark K. Gyandoh
Kessler Topaz Meltzer & Check, LLP
mgyandoh@ktmc.com

Robert I. Harwood
HARWOOD FEFFER LLP
rharwood@hfesq.com

Arvind B. Khurana
MILBERG LLP
akhurana@milberg.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Michael M. Maddigan
O'MELVENY & MYERS LLP
mmaddigan@omm.com

James A. Maro
BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP
jmaro@btkmc.com

Thomas James McKenna
GAINEY & MCKENNA
tjmckenna@gaineyandmckenna.com

Donna Siegel Moffa
Kessler Topaz Meltzer & Check, LLP
dmoffa@ktmc.com

Peter A. Muhic
Kessler Topaz Meltzer & Check, LLP
pmuhic@ktmc.com

Gary P. Price
LEWIS & KAPPES
gprice@lewis-kappes.com

Samuel K. Rosen
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022

32

Thomas R. Ruge
LEWIS & KAPPES
truge@lewis-kappes.com

Christopher G. Scanlon
FAEGRE BAKER DANIELS LLP - Indianapolis
chris.scanlon@FaegreBD.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

Gary S. Tell
O'MELVENY & MYERS, LLP
gtell@omm.com

Jessica L. Thorn
O'MELVENY & MYERS, LLP
jthorn@omm.com

S. Melisa Twomey
WEXLER WALLACE LLP
smt@wexlerwallace.com

Kenneth A. Wexler
WEXLER WALLACE LLP
kaw@wexlerwallace.com